TOWN OF WEST GREENWICH

v.

A. CARDI REALTY ASSOCIATES
et al.

No. 99–559–Appeal.

Supreme Court of Rhode Island.

Nov. 21, 2001.

Nancy Giorgi, Johnston, Michael A. Ursillo, Rebecca Tedford Partington, Providence, for Plaintiff.

Elizabeth McDonough Noonan, Providence, Edward L. Magiacomo, Paul P. Baillareon, for Defendant.

Present: LEDERBERG, BOURCIER, FLANDERS, and GOLDBERG, JJ.

## O P I N I O N

GOLDBERG, Justice.

This case came before us on October 2, 2001, on appeal by the defendant, A. Cardi Realty Associates (Cardi), and a cross-appeal by the plaintiff, the Town of West Greenwich (town), from a judgment in the Superior Court that permanently enjoined Cardi from continuing to operate a large-scale commercial earth removal and gravel business on property in the town. The judgment also permanently enjoined the town from enforcing cease-and-desist orders against Cardi for purposes of limited earth removal from the site, based on a finding by the trial justice that Cardi had established a legal nonconforming use for the removal of "a few truckloads" of gravel per year.

### Facts and Procedural History

The property that is the subject of this litigation is described as Assessor's Plat 55, Lot No. 6 (lot No. 6) and Assessor's Plat 56, Lot No. 3 (lot No. 3), located on Hopkins Hill Road in West Greenwich and owned by Cardi. Lot No. 3 was purchased by Cardi in 1966 and lot No. 6 was purchased in 1987 with the intention, according to the testimony, of extending the operations of lot No. 3.[1] Although extensive excavation and commercial sale of earth and gravel took place on lot No. 3 during Cardi's first two years of ownership, the annual volume decreased thereafter. Stephen Cardi, treasurer for defendant, testified that lot No. 3 originally was purchased in 1966 as a "like-kind exchange" for tax purposes with proceeds resulting from the condemnation by the State of Rhode Island of Cardi's gravel operation in Cranston.[2] Stephen Cardi further testified that, with the specific intent to preserve the nonconforming nature of the use, he personally conducted limited but continuous excavation and commercial sale of earth materials from lot No. 3 from the time of the purchase until this controversy arose. He indicated that this activity con-

---

1. Cardi did not argue in its counterclaim that lot No. 6 had a preexisting nonconforming use and so, apart from a determination that the Town of West Greenwich does not have the authority to zone earth removal, lot No. 6 is not affected by this litigation.

2. According to Stephen Cardi, the property that comprised the gravel operation in Cranston is now the interchange of Routes 295 and 37 in Cranston.

sisted of "very very extensive excavation" on the left-hand side of the lot and "we graded another area which we made into fields." The property otherwise was used as a family farm, including a barn, farm animals, horses and a caretaker who was allowed to reside on the premises free of charge in exchange for caring for the animals and the property.[3] In 1969, West Greenwich enacted a zoning ordinance that required a special exception to conduct earth removal operations within Cardi's zoning district.

Beginning in 1988, Cardi's excavation of lot No. 3 increased markedly: 255,000 tons of earth were removed in 1988 and 25,000 tons of earth were removed annually until 1990, when the town issued cease-and-desist orders for lot No. 3 and lot No. 6. Cardi was ordered to halt its extraction activities unless it obtained a special exception from the zoning board of review. Thereafter, the town filed suit seeking a preliminary injunction against further violations of its orders. Cardi filed an answer and counterclaim and sought to enjoin the town from interfering with its operation. After a failed attempt by Cardi to obtain a special exception from the zoning board, both parties renewed their motions for injunctive relief. In a bench decision issued in December 1997, the trial justice declared that the town had the authority under the zoning enabling act to regulate earth removal activities. This decision was followed by a number of hearings that culminated in a judgment declaring that Cardi enjoyed a preexisting nonconforming use for earth removal operations, but was "permanently enjoined from engaging in commercial earth remov-

al, excavation and graveling operations on the [s]ubject [p]roperty." The trial justice focused on the use of the property in 1969, the date the use became nonconforming, and limited Cardi to "a few truckloads" of earth each year. He concluded that Cardi's significant increase in the extraction of material in 1988 constituted an expansion of a nonconforming use that was subject to regulation by the town. The court held that the town's cease-and-desist order could not be enforced against Cardi with respect to its preexisting nonconforming use, but that Cardi was permanently enjoined from conducting commercial excavation, gravel operations and earth removal upon its property beyond the limitation of a "few truckloads" of gravel a year. From this judgment both parties have appealed.

## Issues Presented

Three issues confront us. First, Cardi has argued that the town does not have the authority, under the zoning enabling act, to regulate earth removal activities of any kind and that such authority, to the extent it exists, must flow from specific enabling legislation. Second, the town challenged the trial justice's determination that Cardi established a preexisting nonconforming use of earth removal in any amount. Finally, relying on the doctrine of diminishing assets, Cardi argued that the town may not prohibit the expansion of a nonconforming use when that use is earth removal.

## Standard of Review

 A judgment in a nonjury case will be reversed on appeal when it can be

---

**3.** Although the town has emphasized that the Cardi family, subsequent to the enactment of the West Greenwich Zoning Ordinance used this property as a family farm, Cardi testified extensively that this use was identical to the gravel operation in Cranston, including cows that were maintained to keep the fields clear and horses for the family's use. He insisted, however, that notwithstanding this activity, gravel and earth material continuously were excavated and removed from the premises.

shown that the trial justice misapplied the law, misconceived or overlooked material evidence or made factual findings that were clearly wrong. *Forte Brothers, Inc. v. Ronald M. Ash & Associates, Inc.*, 612 A.2d 717, 721 (R.I.1992). It is well-settled that when reviewing the issuance of a permanent injunction, this Court will overturn the findings of fact of the trial justice " 'only when [they] are clearly wrong or when the trial justice overlooked or misconceived material evidence.' " *Reback v. Rhode Island Board of Regents for Elementary and Secondary Education*, 560 A.2d 357, 359 (R.I.1989).

## Regulation of Earth Removal Activities

■ Relying on this Court's decision in *City of Warwick v. Del Bonis Sand & Gravel Co.*, 99 R.I. 537, 209 A.2d 227 (1965) (Del Bonis), Cardi challenged the authority of the Town of West Greenwich, in the absence of specific enabling authority, to regulate earth removal and to require a special exception to conduct gravel bank operations. We disagree with this contention. In *Del Bonis*, the City of Warwick sought to enjoin the defendant from continuing earth removal operations that predated the adoption of Warwick's zoning ordinance. The ordinance prohibited the initiation or lateral extension of an existing operation without a special permit from the zoning board of review. This Court sustained the defendant's challenge to the ordinance as an invalid delegation of legislative authority. We held that "commercial or industrial processes by which [the conversion of earth products for land] is accomplished may be restricted as to area and regulated as to the manner in which

the result is achieved." *Id.* at 542, 209 A.2d at 230. Significantly, citing *Boisvert v. Zoning Board of Review of South Kingstown*, 94 R.I. 107, 178 A.2d 449 (1962), we recognized that conditioning earth removal activities on special exceptions was clearly an appropriate exercise of the zoning power when the board "has made [the] antecedent finding that a grant of such exception will neither injure nor offend the neighborhood." *Del Bonis*, 99 R.I. at 543, 209 A.2d at 230–31. We noted that the ordinance in *Boisvert*, unlike the Warwick ordinance before us in *Del Bonis*, contained "specific norms or standards in the form of conditions precedent which control the exercise of the power in the board of review to permit or deny such a use." *Id.* at 543, 209 A.2d at 231. We concluded that the Warwick ordinance so comprehensively defined earth removal as to inhibit all earth removal endeavors, however minor in scope, to the point that it was not a permitted use in *any* use district within the city. *Id.* at 544, 209 A.2d at 231. This is not the case now before us. The town's zoning ordinance permits earth removal operations in Cardi's zoning district by special exception and, as the trial justice correctly noted, this ordinance contains standards with respect to the zoning board's authority to grant a special exception for earth removal activities.[4] A property owner must demonstrate that "the public convenience and welfare will be substantially served * * * [and the relief] will not result in or create conditions that will be inimical to the public health, safety, morals, and general welfare of the community." West Greenwich Zoning Ordinance, Art. I, sec. 6, C. (2)(a)(c) (1982). We are

---

**4.** It was disclosed at oral argument that Cardi's appeal from the denial of its application for a special exception to conduct earth removal operations is pending and has been languishing in the Superior Court for Kent County pending resolution of this appeal.

Since a decision in that case could have rendered this controversy moot, the practice of delaying the resolution of litigation pending an appeal before this Court should be discouraged.

thus satisfied that the improper delegation of permitting authority to the zoning board of review, as found by the Court in *Del Bonis*, is not present in the ordinance in effect at the time this controversy arose.

■ Furthermore, the case of *Kingsley v. Miller*, 120 R.I. 372, 388 A.2d 357 (1978) is additional support for the authority of the town to prohibit commercial earth-removal activities in certain zoning districts. In *Kingsley*, plaintiffs sought a permit from the building inspector of the Town of North Kingstown to conduct earth removal operations on a parcel that was zoned "Village Residential," a use neither allowed nor permitted by way of special exception. The plaintiffs sought a declaration that the provision of the zoning ordinance prohibiting earth removal was null and void because a special enabling act, authorizing the town to enact earth removal ordinances, pre-empted the town's zoning ordinance. The plaintiffs argued that the earth removal ordinance required that a permit be issued upon compliance with its requirements, notwithstanding the zoning district where the property was situated. In reviewing the town's earth removal enabling act and the special acts of several Rhode Island municipalities, this Court noted that the acts specifically provided that the authority of a municipality, under the state general zoning enabling act, was not limited by any earth removal ordinance. We declared that:

> "[T]he General Assembly has clearly indicated that the locale of earth-removal operations is to be determined by the provisions of the town's zoning ordinance. If the zoning ordinance does not permit an earth-removal operation to take place with certain districts, any ordinance enacted under the [special enabling] [l]egislation will afford no additional legislative basis for such an undertaking in those districts.

The [special act] simply allows the town to regulate *all facets of an earth-removal operation*. It in no way supersedes the provisions of the zoning ordinance which specify the uses to which land in the various zoning districts can be devoted." *Kingsley*, 120 R.I. at 377, 388 A.2d at 360. (Emphasis added.)

■ Finally, we reject Cardi's claim that it was not until July 1, 1993, the effective date of the 1991 Zoning Enabling Act, that the municipalities were vested with authority to enact zoning ordinances that could permit, prohibit, limit and restrict extractive industries and earth removal and require the restoration of land after the activities were concluded. While comprehensive, these provisions in no way suggest that municipalities lacked the authority to designate zoning districts within their borders or to legislate the uses allowable in those districts.

We conclude that the town's ordinance is valid and enforceable. Accordingly, our decision today upholding the authority of the town to enact zoning ordinances delineating areas where gravel bank operations may be undertaken, either as a matter of right or by special exception, is determinative of Cardi's appeal as it relates to lot No. 6. Having acquired lot No. 6 subsequent to the enactment of the town's zoning ordinance, Cardi is bound by the provisions of the ordinance. However, since a commercial gravel business is allowed by special exception, Cardi's only avenue of relief is its appeal from the denial of a special exception by the West Greenwich Zoning Board of Review.

### The Finding of a Nonconforming Use

■ After declaring the town's zoning ordinance valid and an appropriate exercise of the police power, the trial justice proceeded to hear evidence relative to Car-

di's argument that it possessed a lawful nonconforming use and the town's assertion that the property was not devoted to earth removal, but actually was a family farm. Factual findings of a trial justice in a nonjury case are entitled to great weight and will not be disturbed on appeal unless found to be clearly wrong or unless the trial justice has overlooked or misconceived material evidence. *South County Sand & Gravel Co. v. Town of Charlestown*, 446 A.2d 1045, 1046 (R.I.1982). This Court's function is to determine whether there was competent evidence to support the finding of the trial justice that Cardi established a lawful nonconforming use by its excavation activities both before and after the enactment of the zoning ordinance and further, whether the trial justice overlooked or misconceived material evidence in reaching this conclusion. Lastly, having found that a lawful nonconforming gravel extraction enterprise existed in 1969, did the trial justice err in declaring that Cardi's subsequent increase in volume amounted to extension of that nonconforming use?

■ This Court previously has held that a mere discontinuance of a nonconforming use for a period does not constitute an abandonment of the use. There must also be evidence of an intent to abandon; mere suspension of the activity is not sufficient. *Id.* at 1047; *see also Washington Arcade Associates v. Zoning Board of Review of North Providence*, 528 A.2d 736, 738 (R.I.1987). Nor are we convinced that a diminution in the activity that comprises the nonconforming use is controlling, particularly when, as here, the commercial enterprise is the extraction and sale of earth products, the need for which varies with the vagaries of the economy and the strength of the construction industry that the material supports.

Stephen Cardi testified that between 1965 and 1968, extensive excavation of a very large area in the south portion of lot No. 3 resulted in "a general lowering [of the grade] of about four or five feet." According to Stephen Cardi, gravel was extracted and sold to Campanella and Cardi Construction, a separate corporation owned in part by his father, who also held a 50 percent ownership interest in Cardi. In 1967, the interest in Campanella and Cardi was sold and a new business, Cardi Corporation, was undertaken consisting of concrete, asphalt and construction endeavors. According to the testimony, because Cardi Construction was operating a "full time, full-blown [gravel] operation" in Coventry, the extraction of gravel from lot No. 3 was diminished until the material was needed in 1988, at which point mass excavation of the lot resumed. Cardi insisted that during this entire period he continued to excavate and market gravel and earth products from lot No. 3 until ordered to cease-and-desist in connection with this litigation. According to Stephen Cardi, he personally went to the property "two or three times a year to make sure some portion of that place had some digging [going] on." In addition to the activities of Stephen Cardi, Bob Leahy, the caretaker for the property, who also was an operating engineer, excavated portions of lot No. 3 for commercial purposes after 1968. Leahy used his own loader to dig earth on the property as a side business. Finally, John Gagliardi, the union steward and truck driver for Cardi Corporation testified that he recalled sending three or four trucks a day, three to four days per week in the summer months between 1970 and 1988 and that this activity was conducted almost every summer during that period.

■ Based on this testimony, the trial justice found that Cardi enjoyed a lawful nonconforming use on lot No. 3 consisting

of the extraction and sale of gravel and earth materials. Specifically, the trial justice relied upon the evidence that after the mass excavation for construction of the pond (which the town insisted was the primary motivation for excavation of the lot), both Stephen Cardi and Bob Leahy "continued to remove truckloads of earth from the site each year" and that these activities demonstrate "more than [a] mere plan to excavate the property, they evince an existing nonconforming use which is permitted to continue." Clearly, the trial justice relied upon substantial and competent evidence in the record to support the finding of a nonconforming use. We are not persuaded that the decision of the trial justice is clearly wrong; nor are we convinced that the trial justice overlooked or misconceived material evidence. He recognized that the excavation in 1967 resulted in the construction of the pond and that the land also was used for various farming activities. He rejected the town's argument that these activities defeated a nonconforming use. The town argued that farming and horses suggests the property was not *devoted* to excavation, but these activities are not mutually exclusive. The testimony disclosed that numerous acres of trees were cleared to prepare for excavation; that loam was stockpiled and returned to the fields to prevent erosion and that the cows were intended to keep the fields free of vegetation. Further, the fact that the volume of material excavated for a period was not substantial is of no moment to the existence of a nonconforming use. In the absence of testimony relative to Stephen Cardi's vigilance in protecting the nonconforming use of the property, even "a discontinuance of a nonconforming use for a period of time does not constitute an abandonment of that use." *South County Sand and Gravel Co.*, 446 A.2d at 1047; *Town of Coventry v. Glickman*, 429 A.2d 440, 442 (R.I.1981). Accordingly, the appeal of the town from the finding of a nonconforming use is denied. We must now turn to the limitations placed on this use by the trial justice.

## Expansion of the Nonconforming Use

Contrary to the trial justice's finding that the resumption of mass excavation in 1988 was an expansion of its nonconforming use, Cardi argued that its use always has consisted of the extraction and sale of earth and gravel and that although the volume may have increased in 1988, Cardi previously had undertaken mass excavation of lot No. 3 before the zoning ordinance was enacted. Further, Cardi maintained that the trial justice erred in limiting its operation to the amount of material that was extracted as of the effective date of the ordinance. Finally, Cardi argued that when, as here, a nonconforming use consists of the extraction of natural resources from the earth, expansion into other areas is allowed under the doctrine of diminishing assets.

The trial justice recognized that earth removal operations may include areas that are held in reserve or left vacant or devoted to incidental uses until migration into these areas becomes necessary. He noted that the doctrine of diminishing assets "protects the unique interest created in land reserved for excavation and allows a landowner to expand the perimeters of [a lawful] nonconforming use." However, although he recognized the right to expand the "physical confines of the use," he declared that the doctrine of diminishing assets "does not necessarily protect the right to amplify the intensity of the use." Citing Rathkopf, *The Law of Zoning and Planning*, § 51.07 (1975), the trial justice held that an increase in the *volume* of business "is not permissible where the basic nature and character of the use is changed from that which existed

at the time the use became nonconforming." The trial justice further found that in 1988, the extensive commercial earth removal that commenced, (according to the town) or resumed, (according to Cardi), amounted to more than an increase in excavation activities; it was a change in the basic nature and character of the nonconforming use in violation of the ordinance. We disagree with this holding. It is uncontroverted that before the zoning ordinance was adopted Cardi was engaged in mass excavation on the parcel and that the material that was excavated was sold commercially. The fact that a pond resulted from this activity is of no consequence; the landowner has proved and the trial justice has found that before the zoning ordinance was enacted the land was used for commercial earth removal endeavors. Thus, the nonconforming use has been established and, as the trial justice held, "is permitted to continue." It is not limited to the amount of excavation that was being done on the date the ordinance became effective. Cardi is vested with a lawful nonconforming use and is entitled to excavate the resources within the confines of the area that comprises the nonconforming use.

■ Moreover, when, as here, a nonconforming use has been established, we hold that the question whether an earth removal operation may expand or has been unlawfully expanded should be measured by the intent of the owner, as measured by objective criteria applied to the circumstances that existed when the lot became nonconforming.

Article VIII, Section 1, of the West Greenwich Zoning Ordinance provides "[t]hat no lawful non-conforming use shall be enlarged, extended, expanded, or increased, without an exception by the Zoning Board of Review." Although the right to continue a nonconforming use does not generally include the right to expand or intensify the use, this restriction is more appropriately applied to businesses and other activities that are merely situated on a parcel and not where the land itself is the resource. When the nonconforming use involves the extraction of earth materials, the "doctrine of diminishing assets" may be applicable and serves to protect the unique character of land that is reserved for excavation. It also may permit a landowner to expand the perimeters of a nonconforming use. When confronted with the question of a lateral expansion of an earth removal enterprise, many jurisdictions have declined to follow the traditional and almost universal prohibition against expansion of a nonconforming use. Given the nature of quarrying and mining, when the area in which the activity occurs is consumed, courts have been reluctant to limit the owner to an expansion in depth. *Stephan and Sons, Inc. v. Municipality of Anchorage Zoning Board of Examiners and Appeals,* 685 P.2d 98 (Alaska 1984); *McCaslin v. City of Monterey Park,* 163 Cal.App.2d 339, 329 P.2d 522 (1958); *County of Du Page v. Elmhurst–Chicago Stone Co.,* 18 Ill.2d 479, 165 N.E.2d 310 (1960); *Town of Billerica v. Quinn,* 320 Mass. 687, 71 N.E.2d 235 (1947); *Town of Wolfeboro v. Smith,* 131 N.H. 449, 556 A.2d 755 (1989).

■ The doctrine of diminishing assets has evolved from the recognition that extractive industries use the land itself and all resources that are found on a given parcel comprise the ongoing business. "As opposed to other nonconforming uses in which the land is merely incidental to the activities conducted upon it, * * * quarrying contemplates the excavation and sale of the corpus of the land itself as a resource." *Syracuse Aggregate Corp. v. Weise,* 51 N.Y.2d 278, 434 N.Y.S.2d 150, 414 N.E.2d 651, 655 (1980). The land is

considered a diminishing asset and the use need not be restricted to the precise geographical area where extraction activities were going on when the lot became nonconforming. Further, courts have acknowledged that the amount and frequency of the recovery of the material is driven by market forces, varies with the seasons and fluctuates with the needs of the industries that depend on the resource. We are not convinced that a nonconforming use consisting of gravel and earth removal can be restricted in area or volume to the exact amount of the activity going on at the time the ordinance was enacted. To so hold would have the effect of eliminating the nonconforming use, an impermissible exercise of the police power. "Unlike other nonconforming uses of property which operate within an existing structure or boundary, mining uses anticipate extension of mining into areas of the property that were not being exploited at the time a zoning change caused the use to be nonconforming." *Hansen Brothers Enterprises, Inc. v. Board of Supervisors of Nevada County,* 12 Cal.4th 533, 48 Cal.Rptr.2d 778, 907 P.2d 1324, 1336 (1996). Migration of the operation into another area of the property is not necessarily a prohibited expansion of the nonconforming use. A gravel operation is viable and has value only in the area where the resources are found; " 'once the minerals are extracted it cannot again be used for that purpose.' " *Id.* at 1337. "Only by allowing the continued excavation of land previously appropriated for that use would an owner truly be able to 'continue' an excavation which he had begun" at the time the zoning ordinance was enacted. *Town of Wolfeboro,* 556 A.2d at 758. Thus, when "there is objective evidence of [a landowner's] intent to expand a mining operation, and that intent existed at the time of the zoning change," the doctrine of diminishing assets protects the unique character of land that

has been reserved for excavation and allows expansion into those areas. *Hansen Brothers,* 48 Cal.Rptr.2d 778, 907 P.2d at 1336.

Significantly, the landowner's intention at the time the zoning ordinance was enacted, to devote all or a portion of a parcel to earth removal is the controlling factor and is not measured by the amount of activity at that precise moment. In *Town of Wolfeboro,* the Supreme Court of New Hampshire adopted a three-pronged test that a landowner must meet to establish a right to expand operations as a nonconforming use:

> "First, [the landowner] must prove that excavation activities were actively being pursued when the [ordinance] became effective; second, [the landowner] must prove that the area that he desires to excavate was clearly intended to be excavated, as measured by objective manifestations and not by subjective intent, and, third, [the landowner] must prove that the continued operations do not, and/or will not, have a substantially different and adverse impact on the neighborhood." *Town of Wolfeboro,* 556 A.2d at 759.

We adopt this analysis as the measure for determining the extent of allowable expansion of nonconforming gravel and earth removal operations. We hold that an owner of a nonconforming earth removal or extractive enterprise has the right to continue his or her operations into other areas of the parcel that can be shown, by objective evidence, to have been intended for excavation as of the date of the ordinance that rendered the use nonconforming. The burden of establishing an intent to excavate a particular area falls on the landowner, the party who bears the burden of establishing a nonconforming use in the first instance. This burden of proof may not be met with evidence merely dem-

onstrating that an owner *planned* to expand at a later point or *intended* to expand into a given area. For example, in *Syracuse Aggregate Corp.*, 434 N.Y.S.2d 150, 414 N.E.2d at 655, the court found that quarrying had been conducted on the parcel since 1926 and that materials had been removed from various portions throughout the parcel. Further, there was evidence that service roads were constructed throughout the property and a processing plant was strategically placed in the center of the property, easily accessible from all areas of the lot. Further, the court found that "no part of the land was ever dedicated to a use other than the quarrying of sand and gravel" and that such outward manifestations of intent, considered in light of the unique character of the business engaged in, can only lead to the conclusion that "the nonconforming use extends throughout the property even though the principal excavation was limited to a five-acre portion of the parcel." *Id.* In contrast, in *Town of Wolfeboro*, the Supreme Court of New Hampshire reversed the finding of the trial court that the owners manifested their intention to excavate the entire lot because the only evidence of that intent was the fact that the land had been timbered twice before the date of the ordinance. *Town of Wolfeboro*, 556 A.2d at 759.

Furthermore, a landowner seeking to expand his operation must prove not only a manifest intent to expand into other portions of the property, but he or she also must meet the third prong of the *Wolfeboro* analysis and demonstrate that the activity will not have "a substantially different and adverse impact on the neighborhood." *Id.* Compliance with this element will have the desired effect of preventing nuisance-type activity and ensure the preservation of the public health and safety.

Turning to the case at hand, the trial justice has found, and we concur, that Cardi was engaged in removing earth and gravel for commercial purposes at the time the ordinance was enacted and thus enjoys a preexisting nonconforming use "which is permitted to continue." The evidence has disclosed that part of the property, as measured by objective manifestations, including clearing trees, lowering the grade and stockpiling loam, actually was being excavated at the time the ordinance was enacted. We are satisfied that Cardi may lawfully continue to excavate this portion of lot No. 3 and is not limited to "a few truckloads" a year. We note, however, that although Stephen Cardi testified that Cardi intended to excavate the entire lot, his testimony concerned activity on "the left" portion of the lot and areas "to the south." The trial justice made no finding respecting the extent of the acreage devoted to earth removal, whether it was all or a portion of lot No. 3. Therefore, we remand this case to the trial justice for a determination of the area or areas actually in excavation when the ordinance was enacted that comprise the nonconforming use. Cardi may excavate such acreage without restriction under the zoning ordinance. In excavating this acreage, Cardi shall not be restricted to "a few truckloads a year," provided that Cardi's "continued operations do not and/or will not, have a substantially different and adverse impact on the neighborhood" than the operation conducted before the zoning ordinance was enacted. *Town of Wolfeboro*, 556 A.2d at 759. Further, Cardi may seek to expand its operation into other portions of lot No. 3 that were not actually being excavated on the date of the ordinance but were specifically designated for earth removal, as measured by objective criteria. With respect to any expansion, Cardi must demonstrate that its continued operation beyond the area where the activity was going

on as of the date of the ordinance, will not have a substantially different and adverse impact on the neighborhood from the operations it conducted before the zoning ordinance was enacted.

## Conclusion

Based on the foregoing, the judgment of the Superior Court is affirmed and vacated in part, the defendant's appeal is sustained and denied in part, and the cross-appeal of the Town of West Greenwich is denied. This case is remanded to the Superior Court for further proceedings in accordance with this opinion.

Chief Justice WILLIAMS did not participate.